## LILLIE M. BREWSTER

*v.*

## ALBERTINE A. ENTZ et al.

[Submitted June 10th, 1915.   Decided November 10th, 1915.]

1. In a suit to obtain a decree that an assignment purporting to assign certain bonds and mortgages is a forgery, and to compel the defendant to restore them to the complainant, evidence *Held*, to show (1) that the complainant's signature to the assignment is a forgery, and (2) that the complainant, not being chargeable with negligence, should not be estopped from asserting that the assignment is a forgery, and that the defendant would be decreed to restore the bonds and mortgages to the complainant.

2. The attorney-at-law who committed the forgery, and who was the witness to the signature of the assignment and signed the certificate of acknowledgment, was not the agent of the complainant with power to execute the assignment of mortgages in question, whatever agency existed applying only to the collecting of interest.

*Mr. George W. Betts, Jr.,* and *Mr. Rufus W. Sprague* (of the New York bar), for the complainant.

*Mr. Cornelius Doremus,* for the defendants.

GRIFFIN, V. C.

The bill in this cause is filed to have it decreed that an assignment dated December 23d, 1910, apparently, acknowledged April 21st, 19   , and recorded June 28th, 1911, purporting to assign two bonds and mortgages is a forgery, and that the defendant Albertine A. Entz should restore the bonds and mortgages to the complainant.

The forgery is said to be the act of one Paul Walton (now deceased), an attorney-at-law, who was the witness to the signature and signed the certificate of acknowledgment.

Walton was the attorney of the husband of the complainant, who died in 1903, drew his will, attended to its probate, and

thereafter secured investments for the complainant, collected interest and remitted the same to complainant. She did not entrust him with the keeping of the securities. These she retained and kept in her safe deposit box.

In November, 1905, Walton secured an investment of $2,500 in a bond and mortgage made by Richard G. Korkemas, Salih Dabdoub and others to the complainant, which bond and mortgage are dated November .16th, 1905, and the mortgage was recorded December 5th, 1905.

Another investment of $1,500 was procured by Walton in a bond and mortgage dated June 13th, 1908, made by Salih Dabdoub and others, which mortgage was recorded on September 9th, 1908.

The foregoing bonds and mortgages, shortly after recording, were delivered by Walton to complainant, in whose possession they remained until the spring of 1910, and are the bonds and mortgages mentioned in the assignment attacked.

In the spring of 1910, complainant called on Walton regarding policies of insurance on the mortgaged property. He suggested that she bring all her papers, bonds and mortgages to him to examine, that he would look over them, ascertain what were missing and hand them back in a day or two. She, on the same day, took her papers from her safe deposit box and delivered them to him. She then left the city, and was gone until after July 4th. Within a week after her return she telephoned Walton's office and was informed that he was not there. About that time Walton suffered a serious injury, and until his death, which occurred August 11th, 1914, remained continuously at his club, and did not again return to his office.

On December 11th, 1911, she received, by messenger from Walton, what purported to be the two bonds and mortgages above mentioned, and,. after an examination, placed them in her safe deposit box, where they remained until about December, 1913.

These bonds and mortgages were complete in every detail, containing signatures of parties and witnesses; and the mortgages had endorsed on them the receipt of the recording officer. They were copies of the original bonds and mortgages, but were delivered to the complainant as the originals.

The names of the mortgagors were strange to the English language; their signatures to the original bonds and mortgages were labored; and in the forged copies an effort was made to ·imitate the signatures of the parties, witnesses, officers who took the acknowledgment and the recording officers, to deceive the complainant.

From the date complainant delivered the bonds and mortgages to Walton, in the spring of 1910, until about March, 1913, she received the interest on them regularly from Walton, and on November 19th, 1912 (more than a year after the forged assignment was recorded), he sent her the check of one Wasserman (who was then the owner of one of the parcels covered by one of the mortgages) for $75, drawn to the order of Walton, and by him endorsed to the complainant, in payment of the interest due on the mortgage, which check was given by Wasserman for the purpose of paying this interest.

In September, 1913, interest on some of the mortgages being overdue, complainant wrote Walton regarding it. Towards the end of 1913 she says she grew suspicious, because he became slow in his payments of interest and other moneys. There was then $75 due for interest from March to September. She accordingly asked the opinion of a lawyer, but did not retain one until about January, 1914. In September, 1914, the month following Walton's death, she learned of the forgeries and filed her bill October 5th, 1914.

The defendant purchased the bonds and mortgages, received the genuine ones, and the forged assignment from Walton, to whom she delivered her check to his order as attorney, and notified the owners of the mortgaged premises of the assignment. Before making the purchase she inquired into the value of the premises, and made the usual investigation in such cases, but did not communicate with the complainant.

While the assignment, which is in typewriting, is dated December 23d, 1910, it was not actually typed until some time after January, 1911. This is made perfectly clear by the testimony of one Knappen, who typed the assignment and made copies of the bonds and mortgages by filling in the spaces in the printed forms.

The defendant primarily denies that the assignment was forged; and, secondarily, if forged, insists that complainant was negligent, which negligence enabled her attorney to perpetrate the fraud, and, therefore, she should be estopped from setting up the forgery.

First, is the instrument forged?

In this case there is the usual conflicting testimony of professional experts—one asserting that the instrument was forged, the other that it was not—both being equally positive. This testimony, standing alone, would leave the fact of forgery in balance. A further conflict arises in the testimony of bank tellers. So, that it is important to look to other circumstances in support of these various contentions. That the complainant did not knowingly assign these mortgages is perfectly apparent. The circumstances show that Mr. Walton perpetrated a great fraud. He deceived the complainant when he returned these copies of the bonds and mortgages six months after the forged assignment was recorded, and continued paying her interest for almost two years after the assignment was recorded; and, to further carry out the deceit, sent to her, in payment of the interest, on one of the mortgages, the check of the owner of the mortgaged premises.

If this instrument was not forged, it is inconceivable that Mr. Walton should resort to such deceitful practices, if, as a matter of fact, the complainant had executed the assignment; unless he had tricked her into signing the instrument, she believing it was something else.

Walton resided in a bachelors' club, where ladies were not admitted. The complainant did not see Walton after the delivery of the bonds and mortgages to him in the spring of 1910. She executed no papers in his presence, nor did she execute or sign any papers coming from him. In fact, there is not the slightest shadow of evidence in the case to raise the suspicion that she was tricked into signing this instrument in the belief that it was something else.

I am, therefore, of opinion that the signature to the assignment is not the signature of the complainant, but is a forgery.

The next question to be considered is that of estoppel arising from the alleged negligence on the part of the complainant.

The complainant trusted Walton, who, so far as there is any testimony in the case, was a respected attorney-at-law, whose integrity was not even suspected. She did not deposit the bonds and mortgages with him to be held for her; they were placed in his hands for a certain purpose, with the understanding that they were to be delivered within a day or two. She went to the shore for a short period, and on her return sought to procure her papers, but at that time, apparently, Walton had sustained this injury which kept him continuously at his club. While there, she endeavored to procure from him the papers, and did, as she understood, actually receive them on December 11th, 1911, when Walton sent the spurious bonds and mortgages to her in a package. They had been out of her possession for eighteen months; there was nothing in the instruments so returned that could excite her suspicion that what she received were not the genuine bonds and mortgages—especially so, when coming from a man in whom she had confidence. Suspicion was further removed by the fact that she had received her interest regularly from Walton until September, 1913, when the last six months' interest fell due, and, remaining unpaid until December, her suspicions being aroused, she spoke to a lawyer, whom she retained in January, 1914. What the lawyer did does not appear. But the fact remains that the existence of this assignment was not discovered until September, 1914, after the death of Walton.

The conduct of the complainant in the transaction, from the spring of 1910, when she delivered the bonds and mortgages to Walton, down to September, 1914, when she discovered the fraud, was that of a normal, ordinary person having confidence in an attorney-at-law of good repute. I fail to see anything in the case which would justify an assumption that the attorney was a criminal, or that she was in any danger of losing her securities, because, during all this period, she rested in the belief that these bonds and mortgages were lying in her safe deposit box. If the conduct of the complainant can be said to have been negligent, it might, with equal force, be said that the defendant was also negligent in this, that she likewise accepted from the supposed reputable attorney bonds and mortgages with an assignment supposed to have been executed by his client, and gave him a check

for the same, without first seeking out the complainant and asking her if she had executed the assignment. But, as I see it, neither party was negligent, in the eye of the law. Both pursued the ordinary methods of prudent persons in such cases.

I have, therefore, reached the conclusion that Walton was not the agent of the complainant with power to execute the assignment of mortgages in question. Whatever agency existed applied only to the collecting of interest. His act in signing the complainant's name to the instrument was criminal; and the complainant, not being chargeable with negligence, should not be estopped from asserting that the assignment is a forgery. *Lawson* v. *Nicholson, 52 N. J. Eq. 821; Heyder* v. *Excelsior Building and Loan Association, 42 N. J. Eq. 403.*

This case, in many respects, is quite similar to *Lawson* v. *Nicholson, supra.* There, a lady gave to the scrivener, who drew the bond and mortgage in question, a large bundle of papers, including this bond and mortgage, wrapped in strong paper, tied and sealed, to be placed in his fireproof. The scrivener broke open the package, took from it the bond and mortgage, endorsed on the mortgage a receipt for cancellation (in doing which he committed a criminal act), gave it to the owner of the land from whom he received payment of the principal, and the mortgage was canceled of record. Thereafter the scrivener absconded. The owner had as little knowledge of the extent of the scrivener's agency as the defendant here had of Walton's. The court decreed that the bond and mortgage be revived and reinstated.

In one respect this case is much stronger than *Lawson* v. *Nicholson, supra,* in this, that while it is a rather common practice at the bar for attorneys-at-law having the possession of a bond and mortgage to collect the interest, receive the principal and endorse the mortgage for cancellation (which payment of the principal the mortgagor makes with some risk, as pointed out by Mr. Justice Parker in *Steadman* v. *Foster, 83 N. J. Eq. 641*), there is no known practice of such attorneys signing their clients' names to assignments of mortgages.

In *Heyder* v. *Excelsior Building and Loan Association, supra,* where a bill was filed to set aside a cancellation of a mortgage,

Mr. Justice Knapp, speaking for the court of errors and appeals, said:

"Cancellation of a mortgage on the record is only *prima facie* evidence of its discharge, and it is left to the owner making the allegation to prove the canceling to have been done by fraud, accident or mistake. Such proof being made, the mortgage will be established, even against such subsequent purchasers or mortgagees without notice. *Trenton Banking Co.* v. *Woodruff, 2 N. J. Eq. 117; Harrison* v. *New Jersey Railroad Co., 19 N. J. Eq. 488.*

"Between a mortgagee, whose mortgage has been discharged of record, solely through the unauthorized act of another party, and a purchaser who buys the title in the belief, induced by such cancellation, that the mortgage is satisfied and discharged, the equities are balanced, and the rights, in the order of time, must prevail. The lien of the mortgage must remain, despite the apparent discharge."

In that case it appeared that the complainant made a loan to its attorney, and took a bond and mortgage for the same, which mortgage was recorded. The attorney endorsed a receipt for cancellation upon the mortgage and the same was canceled of record. The record of the discharge was general in form. It contained no matter which made it the duty of the purchaser to institute a personal inquiry of the mortgagee. The mortgage was not stolen, nor was there any crime committed in procuring possession of it. The inference from the testimony was that it had remained in the possession of the mortgagor from the date of record. The court found that the officers of the association were culpably negligent in allowing the mortgage to remain in the custody of the mortgagor, and accordingly sustained the cancellation.

The distinction between this and the last-mentioned case is that here the defendant innocently acquired the possession of these bonds and mortgages through the criminal act of Walton, and the complainant was not negligent.

I will advise a decree setting aside the assignment, and directing a return of the bonds and mortgages to the complainant.